RADER, Appellant, vs. UNION FALLS POWER COMPANY, Respondent.

*May 9—June 6, 1933.*

*L. M. Evert,* attorney, and *P. A. Martineau* of counsel, both of Marinette, for the appellant.

For the respondent there was a brief by *Lehner & Lehner* of Oconto Falls and *V. J. O'Kelliher* and *Adolph P. Lehner,* both of Oconto, attorneys, and *James F. Hamill* of New York City of counsel, and oral argument by *Mr. Adolph P. Lehner* and *Mr. O'Kelliher.*

NELSON, J. The trial court filed a written decision in which it reviewed the evidence adduced upon the trial, the contentions of the respective parties, and the law applicable. The court concluded that the testimony of the plaintiff and his neighbors was wholly insufficient to establish with any degree of certainty that the wet condition of plaintiff's land was due to the raising of defendant's dam, rather than to

the nature of the soil, the elevation of the land, the rainfall, and other elements. The court further concluded that the expert testimony, based largely upon insufficient and unsatisfactory lay testimony, was lacking in convincing power. The trial court was evidently of the opinion that this action is ruled by *Application of Gehrke,* 176 Wis. 452, 186 N. W. 1020, in which it was held that the trial court's conclusion, that the wet condition of the petitioner's lands therein was the result of the construction of the dam, could not be sustained, because the cause of the wetness of the applicant's lands under the facts rested in speculation and conjecture, and because the wetness of the applicant's lands might have been caused either by the raising of the dam or excessive rainfall, and therefore that the real cause of the wetness of the applicant's lands could not be established with any degree of certainty.

In 1909 plaintiff purchased a wood forty located about a mile from the westerly limits of the city of Marinette. In 1911 he built a house on it and continued to clear it. The northeast corner of the plaintiff's lands is located about a mile and a quarter from the Menominee river, which is dammed by the Park milldam owned by defendant, and about three-quarters of a mile from the neck of Coulter's slough, an arm of the dam. The dam itself is located about a mile and a half east of plaintiff's land and about a half mile to the north. Ever since 1922 defendant has maintained the level of the water in its dam at an elevation of about 610½ feet, although without lawful authority so to do, prior to the year 1929. About three miles west of the plaintiff's lands is the Peshtigo river, upon which another dam is located at a point about three and a quarter miles west of plaintiff's land and a mile north. For some years the water in that dam has been maintained at an elevation of 621 feet. The soil of plaintiff's land, and other surrounding lands, is concededly peat and muck, with sand beneath. Here and

there upon plaintiff's land and other surrounding lands, "sand islands" exist. It is undisputed that at the time plaintiff purchased his land tamarack trees were growing thereon. At the time plaintiff purchased his land there existed along the north side of it a ditch which had been constructed by the town. This ditch apparently starts at plaintiff's northwest corner and continues easterly along his forty to about the center of the next forty, then continues southeasterly across a forty and a half, then easterly for a forty and a half, then northerly, and ultimately runs into Coulter's slough. Another ditch on the west side of plaintiff's land, constructed about 1920, runs on the east side of the north-and-south highway and connects with the first mentioned ditch at the northwest corner of plaintiff's land. At a point across the north-and-south road from the northwest corner of plaintiff's land a ditch runs to the west along the southerly side of the highway for about three-quarters of a mile, where it connects with a ditch which was constructed by drainage commissioners in a drainage district containing main ditches and laterals, all of which ultimately empty into the Peshtigo river at a point about two miles below the dam. It is undisputed that shortly after plaintiff purchased his land he dug a ditch in the northwest corner thereof running from a point within his land to the ditch on the north side thereof.

From the undisputed testimony it is obvious that when plaintiff purchased his forty it was low and marshy in character. The plaintiff himself testified:

"Well, when I moved on it, it wasn't so bad. It was bad, there was plenty of water, no ditch at all in front to drain the water. The county had a little bit of a ditch along side, so I lived there three years, then I went to the town to open the ditches to help me out so they cleaned out, went up to the slough and cleaned it out."

The sum and substance of plaintiff's testimony is that after 1916 he had pretty good crops with some exceptions

up to the year 1923, at which time his crops were still pretty fair, but in the fall of 1923 his farm was kind of wet and in the spring of 1924 his oats turned yellow and fell over; that his crops continued to be very unsatisfactory up until the years 1930 and 1931, when his crops, including oats and hay, were again good; that at different times while residing on his farm he had dug holes in different places; that during the earlier years he had been able to dig down four feet without striking water; that in later years he had dug down about a foot or so below the surface and had struck water. The plaintiff's recollection was faulty in many respects and he did not testify as to the location of the various holes dug, the purpose thereof, the time of the year when dug, or whether the particular season was wet or dry. The elevations taken at various points on plaintiff's land run all the way from an elevation of 614 taken at a ditch to 632 taken on a sand island. The elevation at his northwest corner is 618, on the northeast corner 615.1. It is not asserted that the waters of the dam backed up upon the plaintiff's land, but it is contended that the raising of the dam two and a half feet has interfered with the natural underground drainage which the plaintiff's land enjoyed prior to the time the dam was raised. Testimony, similar to plaintiff's, was given by certain of his neighbors who are also applicants in similar proceedings against the same defendant and who testified to conditions on their lands. A kodak picture was exhibited by one of the neighbors showing a rather large pond of water on his own land in February of a certain year. This neighbor testified that there was, at that time, no frost in the ground and that the water did not drain off but remained there for a considerable period of time. It was not shown, however, that the water seen in the picture came from defendant's pond. Enough has probably been said to describe the character of the lay testimony adduced by the plaintiff in support of his contention that the water-table under his

soil had been raised as a result of raising the dam. The trial court was of the opinion that such testimony was wholly insufficient to prove with any degree of certainty that the wetness of the plaintiff's farm at the different times mentioned was caused by the raising of the dam. A reading of all of the testimony adduced by the plaintiff impels the conclusion that it is insufficient to support the answer of the jury to the first question. When it is considered that there is a difference in elevations between the pond at 610½ and the plaintiff's land, averaging six and a half feet or more, and when it is considered that the undisputed testimony shows that the lands throughout that section produced good and satisfactory crops during the years 1930 and 1931, which were rather dry years as compared with other wet years when the plaintiff's crops were poor, we think it cannot be said with any degree of certainty that the wet conditions described by the plaintiff which largely existed in the spring of the year were caused by raising the water level of the dam.

The plaintiff testified that when the water in the dam was high his farm was wet, and when the water in the dam was lowered the wet condition on his farm disappeared. Experiments carefully conducted by defendant's engineer, who dug test holes and made exact observations for the purpose of determining what, if any, relation there was between the height of the water in the dam and the height of the water-table, contradicted the plaintiff's testimony with respect to the rapidity with which lands were affected by the raising or lowering of the level of the water in the dam.

In addition to the lay testimony, plaintiff produced several experts, two of whom testified to geological conditions existing to the west of plaintiff's lands which, in their opinion, made it impossible for his land to be affected in any manner by seepage from the Peshtigo dam, in which the water was maintained at a level substantially higher than the surface

of plaintiff's land. Another expert testified to actual conditions observed by him where the ditch first above mentioned cuts through a culvert at Coulter's bridge. This point is about one-eighth of a mile more or less southwesterly from the neck of Coulter's slough. In October, 1929, the witness observed that a small amount of water was flowing through the culvert from north to south rather than toward the slough, and that the water soon soaked into and disappeared in the sands of the ditch. He further testified as an expert to the obvious fact that when the water-table is raised to within one foot of the surface of the farm lands such lands are of little value for agricultural purposes. The trial court, as before stated, was of the opinion that the testimony adduced by plaintiff was wholly insufficient to prove that the raising of defendant's dam was responsible for the conditions described by plaintiff. The trial court was of the opinion that a verdict should have been directed in favor of the defendant, but, in view of the time spent preparing for trial and expenses incurred, thought best to take a verdict so that in case this court should be of the opinion that a verdict should not have been directed, another trial would not be necessary. We think the trial court was right in changing the jury's answer to the first question and in ordering judgment dismissing the plaintiff's complaint.

*By the Court.*—Judgment affirmed.